**U.S. FIRE INSURANCE CO., as subrogee of Michael Skurnick Wines, Inc., Plaintiff,**

v.

**S/S JEBEL ALI, her engines, boilers, tackle, etc., and United Arab Shipping Co. (S.A.G.), Defendants.**

**UNITED ARAB SHIPPING COMPANY (S.A.G.), Defendant, Third–Party Plaintiff,**

v.

**UNIVERSAL MARITIME SERVICES CORP. and Intermodal Industries, Inc., Third–Party Defendants.**

**No. 91 Civ. 3872 (PKL).**

United States District Court, S.D. New York.

Jan. 19, 1995.

Kirlin, Campbell, Meadows & Keating, New York City (Kevin J. Hartmann, of counsel), for third-party plaintiff.

Edward J. McCarren, New York City, for third-party defendant.

1. The other third-party defendant, Intermodal Industries, Inc. ("Intermodal"), has never appeared in this litigation and is apparently in default. *See* Memorandum of Law of United Arab Shipping Co. (S.A.G.) in Support of its Motion for Summary Judgment on its Third-Party Claims for Indemnity Against Universal Maritime Services Corp. ("UASC mem.") at 1 n.

## OPINION AND ORDER

LEISURE, District Judge:

The third-party plaintiff, United Arab Shipping Co. (S.A.G.) ("UASC"), moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on its third-party claims for indemnity against third-party defendant, Universal Maritime Services Corp. ("Universal").[1] UASC asserts that Universal owes it money for damage that occurred to a shipment of wine. Universal, in turn, moves for summary judgment to dismiss the third party claims alleged by UASC as against Universal. For the reasons stated below, UASC's motion is denied and Universal's motion is granted.

## BACKGROUND

In October 1990, UASC carried aboard its motor vessel, the JEBEL ALI, a refrigerated container of French wines from Fos–Sur–Mer, France to Port Newark, New Jersey. UASC mem. at 1. On arrival at the discharge port, the vessel berthed at the ocean terminal of UASC's stevedore, Universal. *Id.* Universal, pursuant to a written contract with UASC (the "Contract"), performed stevedoring and certain terminal service for the JEBEL ALI. Universal mem. at 2.

The shipper had received the container from UASC several days before the voyage began and had loaded the wines into the unit. *Id.* It then delivered the container to the vessel with instructions, printed on the bill of lading, to keep the wines in the container at temperatures of 50 degrees to 55 degrees Fahrenheit. *Id.* On the voyage from France to the United States, the ship's electrical officer reported in the reefer log book that the part-low temperature recorder was defective, and that he therefore took temperature readings from a second device, the digital display of the control air temperature. Universal mem. at 3. Prior to the ships' arrival in Port Newark, UASC provided Uni-

1; Memorandum of Law of Universal Maritime Service Corp. in Opposition to the Motion of United Arab Shipping Co. for Summary Judgment and in Support of Universal's Cross Motion Against United Arab Shipping Co. for Summary Judgment Dismissing the Third Party Claim ("Universal mem.") at 2.

versal with the vessel's bay plan, which instructed Universal concerning the cargoes and containers that were to be discharged into the stevedore's care. UASC mem. at 1.

Universal discharged the container from the ship after employees of another independent contractor, third-party defendant Intermodal, had disconnected the electrical hookup of the container on the ship. Universal mem. at 2. The container was then taken by Universal longshoreman to a location on the terminal where electrical power sources are situated, and an Intermodal mechanic attached the reefer container to an electrical outlet. *Id.*

The cargo remained in Universal's possession from October 14, 1990 to October 18, 1990, when the consignee accepted delivery. UASC mem. at 1. When the container was opened, however, it was apparent that the wines had been subjected to extreme temperatures. *Id.* Ice crystals were visible on some bottles, corks had popped on others, and wine stained a number of cartons and labels. *Id.* The consignee decided that the wine had to be destroyed. *Id.* at 2.

The consignee's cargo underwriter reimbursed the importer for the loss, and then commenced this action. *Id.* UASC settled the action over a year ago, but Universal did not participate in the settlement. *Id.* UASC now seeks to recover in indemnity from Universal, for an alleged breach of implied warranty, the $111,696 that UASC paid to plaintiff in settlement, together with the $41,232.97 in litigation costs and attorneys' fees that UASC incurred prior to settlement.

## DISCUSSION

### A. *Right to Indemnity*

#### 1. *Potential Liability Sufficient*

UASC contends that although it settled with the cargo underwriter before the Court made any determination of UASC's actual liability, under the facts of this case, it need only establish its potential for liability to the underwriter to recover indemnity from Universal. The Second Circuit has held:

> an indemnitee can only recover from an indemnitor upon proof of the indemnitee's

potential liability if (1) the settlement is reasonable, and if (2) the indemnitor has sufficient notice in which to object to the settlement terms. When the indemnitor objects and the indemnitee fails to tender the defense of the action, the indemnitee must prove actual liability.

*Atlantic Richfield Co. v. Interstate Oil Transport Co.,* 784 F.2d 106, 112 (2d Cir. 1986), *cert. denied,* 479 U.S. 817, 107 S.Ct. 75, 93 L.Ed.2d 31 (1986); *see also Jordan International Company of Delaware v. M.V. Cyclades,* 782 F.Supp. 25 (S.D.N.Y.1992).

■ USAC observes that "[a] shipper or consignee who has not proved delivery in good condition may nevertheless establish a *prima facie* case for recovery by producing sufficient evidence that the nature of the damage suffered indicates that the damage occurred while the cargo was in the carrier's custody." *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 355 (2d Cir.1981). UASC contends that (1) the evidence in this case establishes its potential, if not its actual, liability; (2) the settlement was reasonable; (3) UASC tendered its defense to Universal; and (4) Universal refused to accept the defense and did not voice any objection to the settlement terms.

This Court finds that proof of potential liability is sufficient in this action because Universal does not dispute that the settlement was reasonable nor that it was offered the opportunity to assume responsibility for the defense. Moreover, this Court finds that UASC was, at least, potentially liable to U.S. Fire Insurance Co.

#### 2. *Breach of Implied Warranty*

Such a finding, however, does not end this Court's inquiry. UASC seeks to recover in indemnity from Universal, for an alleged breach of implied warranty of workmanlike service. This Court, therefore, must determine whether such an implied warranty actually existed because, otherwise, Universal has no duty to indemnify.

UASC contends that " 'failure on the part of the stevedore to explain what occurred to the cargo in its control gives rise to a presumption that the stevedore breached this

implied warranty.' (of workmanlike service). *Stein Hall & Co. v. S.S. Concordia Viking,* 494 F.2d 287, 290 (2d Cir.1974)." UASC mem. at 6. "[T]he implied warranty may be breached even where ... there has been no showing of negligence on the stevedore's part." *David Crystal, Inc. v. Cunard Steam–Ship Co.,* 339 F.2d 295, 299 (2d Cir. 1964), *cert. denied,* 380 U.S. 976, 85 S.Ct. 1339, 1340, 14 L.Ed.2d 271 (1965). UASC further maintains that although the implied warranty of workmanlike service can be disclaimed in a properly drawn contract, contractual provisions that purport to disclaim the warranty are viewed with disfavor and are strictly construed. *See David Crystal* 339 F.2d at 299–300. Finally, UASC argues that the Contract between UASC and Universal contains no express disclaimer of the warranty of workmanlike service.

Universal contends, in turn, that it had no obligation to monitor the temperatures of the reefer cargoes unless it received specific instructions to do so from UASC. Universal alleges that UASC used the services of another contractor, Intermodal, to hook up, unhook, pre-cool, maintain and monitor temperatures of reefer containers while at the terminal of Universal. Universal asserts that the only times in the fifteen years that the Contract with UASC has been in existence that UASC has instructed Universal to perform temperature checks is on those weekends when no reefer mechanic was called in to work. Universal mem. at 5.

Universal argues that the implied warranty of the stevedore to perform its services in a proper and workmanlike manner emanates from the contract terms that the stevedore promised to perform. Universal asserts that, in this case, there was no underlying promise on its part to perform the specific service of maintaining and monitoring the temperature of the container in question. As a consequence, concludes Universal, since it had not undertaken this service, no warranty to do so in a workmanlike manner, implied or

otherwise, existed.[2] This Court notes the language of the Contract:

VI. Indemnification

4) Perishable Cargo—The Contractor shall connect or disconnect electric current used to maintain refrigeration of containers designated in written instructions by Authorized Representatives of the LINE. *The Contractor assumes no responsibility or liability for the maintenance of temperatures or the condition of the cargo while containers are under refrigeration.* The Contractor shall upon the LINE's instructions take whatever practical precaution the LINE directs to protect perishable cargo while on the Terminal. *The Contractor shall not be liable for the condition of the perishable cargo or for any damage to said cargo resulting from temperature changes or conditions, or any claims resulting therefrom.*

Exhibit A to the Notice of Motion at 15, ¶ 4 (emphasis added).

■■■ UASC is correct when it argues that disclaimers of implied warranties of workmanlike service are disfavored and are strictly construed. In this case, however, it is not the warranty of workmanlike service that is disclaimed. Rather, Universal and UASC agreed that Universal would not be responsible for the maintenance and monitoring of cargoes in refrigerated containers. Since Universal was not obligated to perform such a service, it was, *a fortiori,* not required to perform the service in a workmanlike manner. In addition, the Court further finds that even if the relevant language is properly read as a disclaimer of the implied warranty, it is sufficiently explicit to successfully exempt Universal from liability arising from failure to maintain, in a workmanlike manner, temperatures of refrigerated cargoes.

The sections of the Contract to which UASC refers are unavailing. These sections require Universal to plug and unplug reefer containers and make periodic temperature readings as *instructed by the LINE,* Con-

---

**2.** The Court notes that Universal's argument is similar but not identical to the well established precept that an implied warranty of workmanlike service can be limited or superseded by an express provision in the stevedoring contract. *See*

*Stein Hall,* 494 F.2d at 290 n. 1; *David Crystal,* 339 F.2d at 300–302. Universal argues, in effect, that not only was the implied warranty explicitly disclaimed, but that so was the underlying duty.

tract at 7, ¶ 4(b) (emphasis added); to inspect and record temperature of reefer units received, Contract at 8, ¶ 5(f); to maintain property damage liability insurance, Contract at 13, ¶ 1; to be liable for damage to or loss of cargo caused by its negligence, Contract at 13, ¶ 2; and to accept responsibility for reasonable care and control of cargo, containers and equipment while on the terminal, Contract at 14, ¶ 2(c). The Court notes that there is no evidence that Universal ever received specific instructions concerning periodic temperature readings. Moreover, the Court finds UASC's evidence concerning the fact that both Intermodal and Universal had liability insurance to be inconsequential with respect to Universal's purported acceptance of liability in the particular situation of the instant action. The fact that Universal obtained liability insurance merely illustrates that in some situations, an example might be instances of personal injury, Universal expected the possibility of liability.

While there is an argument that these provisions of the Contract, standing alone, might have been sufficient to obligate Universal to exercise good workmanship with regard to the maintenance and monitoring of the refrigerated container involved in the instant action, such provisions are clearly insufficient given the more specific indemnification provisions of the Contract. Particularly, Universal assumed no responsibility or liability for the maintenance of temperatures or the condition of the cargo while containers were under refrigeration. Contract at 15, ¶ 4.

UASC observes that this contractual limitation of Universal's responsibility is found in a section of the Contract that deals with "perishables." It argues that wine is not a perishable, and as a result, Universal was accountable for the monitoring and maintenance of the temperature of the wine. This Court need not do a fastidious analysis of the meaning and etymology of the word "perishable," however, because it is apparent from the face of the Contract that items requiring

proper refrigeration to prevent damage or ruination were "perishable" for the purposes of the Contract. The Court, "[e]ndeavoring to put [itself] in the place of a draftsman not endowed with hindsight, [does] not see how he could realistically have been expected to do better in disclaiming liability for the loss that here occurred." *David Crystal,* 339 F.2d at 301 (Friendly, J., concurring and dissenting in part). "[W]hen a contract is made at arms' length between two business concerns like [carrier] and [stevedore] there is no justification for courts looking with 'disfavor' on the allocation between them of risks...." *Id.*

In sum, since Universal was not, under the Contract, required to monitor or maintain the temperature of the refrigerated container, its failure to do so did not violate any provision, implied or otherwise, of its contract with UASC. *Cf. Doca v. Marina Mercante Nicaraguense S.A.,* 474 F.Supp. 751 (S.D.N.Y.1979). Consequently, this Court finds that Universal did not breach any implied or explicit warranty to utilize good workmanship in monitoring and maintaining the container involved in the instant action.[3] Accordingly, Universal's motion for summary judgment dismissing third-party plaintiff's claim against Universal must be granted, and UASC's motion for summary judgment on its indemnity claim against Universal must be denied.

## CONCLUSION

For the reasons stated above, UASC's motion for summary judgment is denied, and Universal's motion for summary judgment is granted. This action is dismissed as to third-party defendant Universal. The remaining parties are advised to appear in Courtroom 1106 for a pre-trial status conference at 2:00 p.m. on February 17, 1995.

**SO ORDERED.**

---

**3.** The Court notes that if the Contract had not limited Universal's obligations with respect to refrigerated containers, both UASC's and Universal's motion for summary judgment would have to have been denied because material issues of fact exist concerning whether the damage to the wine occurred on the ship or after it was discharged from the ship. This Court could not rule, as a matter of law, that Universal is required to indemnify UASC because it is not clear that the harm occurred while the wine was in Universal's care.